

# NUMBER 13-12-00320-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**JOSHUA ALLEN SCHMUDE,** **Appellant,**

**v.**

**THE STATE OF TEXAS,** **Appellee.**

---

### On appeal from the 24th District Court
### of Jackson County, Texas.

---

## MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Rodriguez and Garza
### Memorandum Opinion by Justice Rodriguez

Appellant Joshua Allen Schmude challenges his conviction for tampering with evidence, a third-degree felony. *See* TEX. PENAL CODE ANN. § 37.09(c), (d)(1) (West, Westlaw through 2013 3d C.S.). By fifteen issues, which we reorganize and renumber as seven, appellant argues that: (1) the trial court erred in denying appellant's motion to

dismiss or quash the amended indictment (the "re-indictment"); (2) the trial court erred in excluding evidence about appellant's booking at the police station; (3) his conviction violated his double-jeopardy rights; (4) the trial court erred in denying his motions to suppress; (5) reversible error occurred when the State failed to respond to appellant's discovery request; (6) the evidence is insufficient to support his conviction; and (7) the trial court abused its discretion in overruling appellant's objection to the State's closing argument.   We affirm.

## I.  Background

The following facts are undisputed.   In the late evening of May 16, 2008, appellant was driving from Houston to Corpus Christi on U.S. Highway 59.   During the drive, appellant and his passenger, Daniel Meltvedt, shared at least one marihuana cigarette. Texas Department of Public Safety Officers Justin Nixon and Donald Bolton stopped appellant for speeding in Jackson County.   The officers testified that when appellant opened his car door, they smelled the odor of burnt marihuana.   The officers asked appellant and Meltvedt to step out of the vehicle.   Both denied smoking marihuana in the car.   Appellant also stated that there was nothing illegal in the car and consented to a search of the car, which revealed no illegal substances.   Finally, appellant allowed the officers to look in his mouth[1]; the officers testified that they saw the residue of chewed marihuana leaves in appellant's teeth and gums.   Appellant and the State disputed the remaining details of the traffic stop—such as, whether appellant admitted to eating the

---

[1] The exact timing and details of the officers' searches of appellant's mouth are provided below in Part V.C.

marihuana "roach" and the behavior and demeanor of the officers. After they searched appellant's mouth, the officers arrested appellant and took him to the Jackson County Detention Center in Edna, Texas, at which time he was booked on misdemeanor marihuana possession charges. The details of appellant's booking at the jail are also disputed. Appellant alleged at pre-trial hearings that the DPS officers threatened him with more serious charges when he stated that he intended to fight the misdemeanor possession charge. The officers denied the threat.

Appellant was subsequently indicted for tampering with physical evidence. *See id.* The indictment was later amended to read as follows:

[O]n or about the 16th Day of May, A.D., 2008, . . . . [appellant] did then and there

## COUNT 1
## Paragraph 1

knowing that an offense, to-wit: Possession of Mari[h]uana, had been committed, did then and there intentionally or knowingly alter or destroy or conceal a thing, to-wit: mari[h]uana, with intent to impair its verity or legibility or availability as evidence in a subsequent investigation or official proceeding related to the offense and that the thing concealed was not privileged or the work product of the parties to the investigation or official proceeding.

## Paragraph 2

And . . . knowing that an investigation or official proceeding was pending or in progress, to-wit: Possession of Mari[h]uana, had been committed, did then and there intentionally or knowingly alter or destroy or conceal a thing, to-wit: mari[h]uana, with intent to impair its verity or legibility or availability as evidence in a subsequent investigation or official proceeding related to the offense and that the thing concealed was not privileged or the work product of the parties to the investigation or official proceeding.

Appellant pleaded not guilty to the re-indictment.

3

Before trial, appellant filed numerous motions challenging the re-indictment. In those motions, appellant argued the re-indictment should be quashed because: (1) it was procured using a false and misleading report from the DPS officers; (2) it was the product of the alleged threat by the officers to indict appellant on a felony offense if he "fought" the misdemeanor possession charge; (3) it misjoins two separate offenses in one count, *see* TEX. CODE CRIM. PROC. ANN. art. 21.24(b) (West, Westlaw through 2013 3d C.S.); (4) the disjunctive language used in both paragraphs, with regard to the proscribed conduct and culpable states of mind, is "contrary to the level of certainty required under Texas law," *see id.* art. 21.11 (West, Westlaw through 2013 3d C.S.); (5) "the State's attorney failed to endorse on it" the names of the witnesses who testified before the grand jury, *see id.* art. 20.20 (West, Westlaw through 2013 3d C.S.); and (6) appellant was not allowed to testify before the grand jury before the re-indictment was handed down. *See id.* art. 20.04 (West, Westlaw through 2013 3d C.S.). Each of the motions was denied by the trial court.

Appellant also filed two pre-trial motions to suppress, arguing that he was in custody at the time he made certain statements at the scene and at the time Officer Bolton looked in his mouth. Because he was in custody and had not been read his rights at the time, appellant argued that the evidence of what he said and what was in his mouth was inadmissible. After a hearing, the trial court denied the motions.

Finally, before trial, Meltvedt was interviewed by an investigator for the State, at which time he gave the investigator incriminatory information about appellant. A month before trial, appellant's counsel sent the following letter to the prosecutor:

4

Dear Mr. Bell:

Please refer to our telephone conversation yesterday . . . .

If the interview between your Investigator (Craig?) and Mr. Meltvedt was recorded, please furnish me with a copy of it for investigative and/or trial purposes. (This request should fall under the requirements of Brady and its progeny about which I had written you earlier.) In addition, I spoke with Mr. Meltvedt and [appellant] after our conversation and believe that you may have been mis or under informed of the matter of circumstances about which you advised me.

Since I will not be ready for trial if Mr. Meltvedt is absent on February 6, I am requesting, for protective purposes with the Court, that a Subpoena be issued for him.

Thank you for your cooperation.

No response from the State appears in the record, and appellant did not raise the matter of the investigator's recording again until after trial.

At trial, there was testimony by Officers Bolton and Nixon detailing the facts set forth above. Meltvedt also testified for the State. He testified that he watched appellant eat "the roach" when he realized they were being pulled over by law enforcement. Meltvedt admitted that, because of his friendship with appellant, he initially lied to the officers about whether appellant ate the marihuana. Meltvedt testified that he decided to "tell the truth" because he had "tried to turn his life around" by joining the military and that he did not want to risk his military career by lying. Meltvedt testified that when he told appellant he was not going to lie and was going to testify for the State, appellant was not "happy" about that. On cross-examination, Meltvedt admitted that he had changed his story several times and, in the past, had a habit of lying, but throughout the cross-examination, insisted that he had seen appellant eat the marihuana. Defense counsel

5

also asked Meltvedt whether he had lied on the stand when he testified that appellant ate the marihuana, to which Meltvedt responded that he had not.

At the close of the evidence, the trial court submitted only the first paragraph of the indicted offense to the jury. The jury found appellant guilty, and after a hearing on punishment, the jury sentenced appellant to ten years' incarceration but recommended that the imposition of the sentence be suspended and that appellant be placed on community supervision. The trial court implemented the jury's recommended sentence.

After trial, appellant's counsel sent the prosecutor a letter inquiring into the recording made by the State's investigator of his pre-trial interview with Meltvedt; counsel noted that he had never received a response from the State and requested that the State respond "as soon as practicable." Appellant then filed a motion to compel exculpatory information, in which he argued that the State failed to comply with his pre-trial request to produce the recording of the investigator's interview of Meltvedt. Appellant asked the trial court to compel production of that recording and any other exculpatory material. No ruling on the motion to compel appears in the record.

## II.  The Re-indictment

By his first issue, appellant complains that the trial court erred in failing to quash and dismiss the re-indictment for three reasons:  (1) despite the fact that the re-indictment included substantive changes from the original indictment, the grand jury did not hear testimony from a fact witness before handing down the re-indictment; (2) it was the product of the alleged threat by the officers to indict appellant on a felony offense if he "fought" the misdemeanor possession charge; and (3) appellant was not allowed to

6

testify before the grand jury before the re-indictment was handed down.

## A. Necessity of a Fact Witness

Appellant argues that the re-indictment was not a "true bill" that conferred jurisdiction on the trial court because no fact witness testified before the second grand jury. Appellant argues that this violated article 20.20 of the code of criminal procedure and article 1, section 10 of the Texas Constitution because the grand jury did not adequately perform its "screening" role. *See* TEX. CONST. art. I, § 10 (providing, in relevant part, that "no person shall be held to answer for a criminal offense, unless on an indictment of a grand jury"); TEX. CODE CRIM. PROC. ANN. art. 20.20 ("The attorney representing the State shall prepare all indictments which have been found, with as little delay as possible, and deliver them to the foreman, who shall sign the same officially, and said attorney shall endorse thereon the names of the witnesses upon whose testimony the same was found."); *see also Lehman v. State*, 792 S.W.2d 82, 85 n.2 (Tex. Crim. App. 1990) ("Texas, unlike some other states, also limits the power of a felony prosecutor by requiring a grand jury to screen all felony charges unless the defendant waives his right to indictment.").

We construe this argument as a challenge to the sufficiency of the evidence supporting the indictment. And it is settled law that defendants cannot challenge the sufficiency of the evidence to support a grand-jury indictment. *See Costello v. United States*, 350 U.S. 359, 362–64 (1956); *Brooks v. State*, 642 S.W.2d 791, 795–96 (Tex. Crim. App. 1982). In rejecting such challenges, courts have stated that an indictment returned by a legally constituted and unbiased grand jury, if valid on its face, is enough to

7

call for trial of the charge on the merits. *See Costello*, 350 U.S. at 362–64; *Brooks*, 642 S.W.2d at 795–96. Appellant's argument clearly goes to the evidence supporting the indictment, and not to the facial validity of the indictment or any bias on the part of the grand jury. Nothing in the record persuades us that appellant's case did not receive the grand jury screening required under the law. *See, e.g.*, *Tarpley v. State*, 565 S.W.2d 525, 532 (Tex. Crim. App. 1978) (holding that even if a grand jury had only considered the testimony of the prosecuting attorney, no reversible error would have occurred so long as an indictment was returned by a legally constituted and unbiased grand jury). We will therefore not reverse the trial court's ruling on this basis.

## C. The Threat

Appellant's next argument is that his re-indictment should have been quashed and dismissed because it was sought by Officer Bolton in retaliation for appellant stating he intended to "fight" a misdemeanor marihuana possession charge. Appellant cites *Blackledge v. Perry* in support of this argument. *See* 417 U.S. 21, 27–29 (1974); *see also Thigpen v. Roberts*, 468 U.S. 27, 30–31 (1984). In *Blackledge*, the defendant was convicted of assault in district court, the first step in a two-tier system under North Carolina law under which he was entitled to appeal his conviction to the superior court. 417 U.S. at 22. In such an appeal, the district-court conviction is erased, and the defendant is entitled to a trial de novo in the superior court. *Id.* The defendant in *Blackledge* exercised his right to appeal his district-court conviction, and during the pendency of the appeal, the prosecutor filed a felony indictment against the defendant based on the same facts. *Id.* at 23. The United States Supreme Court concluded that the sequence of

8

events "pose[d] a realistic likelihood of vindictiveness" on the part of the prosecutor, reasoning that

> [a] prosecutor clearly has a considerable stake in discouraging convicted misdemeanants from appealing and thus obtaining a trial de novo in the Superior Court, since such an appeal will clearly require increased expenditures of prosecutorial resources before the defendant's conviction becomes final, and may even result in a formerly convicted defendant's going free. And, if the prosecutor has the means readily at hand to discourage such appeals—by "upping the ante" through a felony indictment whenever a convicted misdemeant pursues his statutory appellate remedy—the State can insure that only the most hardy defendants will brave the hazards of a de novo trial.

*Id.* at 27–28; *see United States v. Goodwin*, 457 U.S. 368, 373 (1982) ("[I]n certain cases in which action detrimental to the defendant has been taken after the exercise of a legal right, the Court has found it necessary to 'presume' an improper vindictive motive. Given the severity of such a presumption, however—which may operate in the absence of any proof of an improper motive and thus may block a legitimate response to criminal conduct—the Court has done so only in cases in which a reasonable likelihood of vindictiveness exists."). In short, "*Blackledge* prohibits prosecutors from bringing more serious charges on retrial when there is a 'realistic likelihood of vindictiveness.'" *Lopez v. State*, 928 S.W.2d 528, 533 (Tex. Crim. App. 1996).

The relevant facts in this case are as follows. Appellant testified at the hearing on the relevant motion to quash that, at the time of his booking at the Jackson County Detention Center, Officer Bolton threatened to pursue felony charges if appellant "fought" the misdemeanor possession charge:

> [Defense counsel]: All right. Now, was there a conversation between you and the officers?

9

[Appellant]: Yes, there was.

[Defense counsel]: And do you recall what was said?

[Appellant]: Basically, it was along the lines of, you know, I said, "Why are you doing this to me?" And Officer Bolton responded with, "because you have a felony," and that's when I told him that that was a Class A misdemeanor. He was bringing up a juvenile charge that happened when I was 16 years old.

After that I told him that I was going to fight this because they continued to press the issue, okay, go ahead, tell us when did you eat the dope again. And I said, "I'm not going to incriminate myself. I want a lawyer." That's when Officer Bolton approached me and said, "If you tell that to Bobby Bell,"—I didn't know who Bobby Bell was at the time; he's the D.A.—"you'll get more than just probation. You're going to get a third degree felony—tampering with physical evidence." He named the charge.

Appellant testified that Officer Nixon then made a "hand gesture" toward Officer Bolton, which appellant believed was meant as a warning to Officer Bolton to stop threatening appellant. In his testimony at the same hearing, Officer Nixon denied Officer Bolton was inside the jail at the time of appellant's booking. Officer Bolton also testified that he never went inside the jail.

The timing and circumstances of the complained-of conduct in this case are clearly distinguishable from *Blackledge*. *Blackledge* involved a re-filing of more serious charges after the defendant, whom the prosecutor had already succeeded in convicting, proceeded to have his "slate . . . wiped clean" by filing his demand for a de novo trial in the superior court. 417 U.S. at 22. Here, the felony charges were the first charges formally filed against appellant. Appellant seems to ask this Court to extend the

10

reasoning of *Blackledge* to this earlier stage—the prosecutor's initial decision to charge. We decline to do so.   Under *Blackledge*, the presumption of prosecutorial vindictiveness arises when the prosecutor, who has a "considerable stake in discouraging convicted misdemeanants from appealing and thus obtaining a trial de novo," "'up[s] the ante'" by bringing more serious charges on retrial.   *Thigpen*, 468 U.S. at 30 (quoting *Blackledge*, 417 U.S. at 27–28); *see Lopez*, 928 S.W.2d at 533.   We do not believe the variety of prosecutorial vindictiveness identified in *Blackledge* is presented by the facts of this case, wherein the complaint centers on the conduct of the officers who arrested appellant.

In fact, in a later opinion, the Supreme Court stated that "[t]here is good reason to be cautious before adopting an inflexible presumption of prosecutorial vindictiveness in a pretrial setting."   *Goodwin*, 457 U.S. at 381.

> In the course of preparing a case for trial, the prosecutor may uncover additional information that suggests a basis for further prosecution or he simply may come to realize that information possessed by the State has a broader significance. At this stage of the proceedings, the prosecutor's assessment of the proper extent of prosecution may not have crystallized. In contrast, once a trial begins—and certainly by the time a conviction has been obtained—it is much more likely that the State has discovered and assessed all of the information against an accused and has made a determination, on the basis of that information, of the extent to which he should be prosecuted.   Thus, a change in the charging decision made after an initial trial is completed is much more likely to be improperly motivated than is a pretrial decision.

*Id.*   "[T]he mere fact that a defendant refuses to plead guilty and forces the government to prove its case is insufficient to warrant a presumption that subsequent changes in the charging decision are unjustified."   *Id.* at 382–83.   "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury,

11

generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). "[T]he conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation so long as the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification." *Id.* at 364–65 (internal quotations omitted).

We cannot conclude that a presumption of prosecutorial vindictiveness was raised by appellant. That appellant allegedly communicated to Officer Bolton that he would fight a misdemeanor charge—in other words, plead not guilty—does not create a presumption that the felony tampering charges eventually brought by the State were unjustified. *See Goodwin*, 457 U.S. at 382–83. Appellant does not dispute that the State had probable cause to believe that he committed a tampering offense, and at the stage of the proceedings about which appellant complains, the prosecutor still retained considerable discretion to bring any charge supported by the evidence. *See id.*; *Bordenkircher*, 434 U.S. at 364–65. For the foregoing reasons, we are not persuaded by appellant's prosecutorial vindictiveness argument and, as such, cannot conclude that the felony tampering indictment was a violation of appellant's due process rights and should have been quashed for this reason.[2]

## D. Denial of Appellant's Request to Testify

Finally, appellant argues that the trial court erred in failing to quash and dismiss the re-indictment because appellant was not allowed to appear and testify before the

---

[2] We note that although appellant alludes in his brief to other potential bases for quashing the indictment—namely, official oppression by the officers—he provides no citations to authority or substantive argument for these bases, so we do not address them on appeal. *See* TEX. R. APP. P. 38.1(i).

second grand jury. Citing Texas Code of Criminal Procedure Articles 20.04 and 20.17, appellant argues that "the grand [j]ury's duty to receive evidence from a fact witness(es) [sic] involves logically a correlative right in an individual who is affected personally to testify if he/she so chooses." (Emphases removed.) In fact, article 20.04 specifically provides that "[n]o person may address the grand jury about a matter before the grand jury other than the attorney representing the State, a witness, or the accused or suspected person or the attorney for the accused or suspected person *if approved by the State's attorney*." TEX. CODE CRIM. PROC. ANN. art. 20.04 (emphasis added). And it is well-established that "[a] criminal defendant or other person being investigated by the grand jury does not have the right to appear in person or by counsel before the grand jury." *McConnell v. State*, 34 S.W.3d 27, 31 (Tex. Crim. App. 2000) (citing *Rogers v. State*, 774 S.W.2d 247, 262 (Tex. Crim. App. 1989); *Morin v. State*, 682 S.W.2d 265, 267 (Tex. Crim. App. 1983); *Moczygemba v. State*, 532 S.W.2d 636 (Tex. Crim. App. 1976)). We therefore disagree that appellant had a "correlative" right to testify before the grand jury, and the re-indictment was not defective on this basis.

## E.  Summary

Finding no merit in the foregoing arguments, we conclude that the trial court did not err in denying appellant's various motions to quash and dismiss the re-indictment. We overrule this first issue.

### III.  Booking Evidence

By his second issue, appellant argues that the trial court erred in refusing to admit at trial evidence about appellant's booking at the Jackson County jail, evidence appellant

13

argues was necessary to establish the unlawfulness of the charges against him. Specifically, appellant complains that he was not allowed to examine either Officer Bolton or Nixon about the alleged threat Officer Bolton made to charge appellant with a felony. Appellant argues that this: (1) violated his due process rights to challenge the legality of the charges against him, a defensive issue appellant argues he was entitled to raise; and (2) limited his constitutional right to cross-examine the officers.

We first note that appellant made no complaint to the trial court at trial that its exclusion of the booking testimony limited his Sixth Amendment Confrontation Clause rights to cross-examination. *See* U.S. CONST. amend VI. That argument was therefore not preserved for our review. *See* TEX. R. APP. P. 33.1(a)(1); *Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005) (holding that a defendant must specifically notify the trial court that he is objecting on Confrontation Clause grounds); *Garcia v. State*, 210 S.W.2d 574, 579 (Tex. Crim. App. 1948) (holding that the right to confrontation may be waived).

Appellant's remaining argument—that the exclusion of this evidence denied him his due process right to raise a defensive issue that the charge was illegal before the jury—is contingent on his argument that we disposed of above in Part II.C, i.e., that the trial court erred in failing to quash and dismiss his indictment as unlawful based on the alleged threat made by Officer Bolton. In light of our finding of no error in the indictment, appellant cannot show he was harmed by the exclusion of this evidence. *See* TEX. R. APP. P. 44.2.

Appellant's second issue is overruled.

14

## IV. Double Jeopardy

By his third issue, appellant argues that by not submitting the elements in paragraph 2 of the re-indictment to the jury, the trial court deprived appellant of his right to have the jury he helped choose "resolve the entire cause against him" and, therefore, impliedly acquitted him of that conduct. *See United States v. Jorn*, 400 U.S. 470, 484 (1971) ("[T]he crucial difference between reprosecution after appeal by the defendant and reprosecution after a sua sponte judicial mistrial declaration is that in the first situation the defendant has not been deprived of his option to go to the first jury and, perhaps, end the dispute then and there with an acquittal. On the other hand, where the judge, acting without the defendant's consent, aborts the proceeding, the defendant has been deprived of his 'valued right to have his trial completed by a particular tribunal."). And because paragraph 2 contains some of the same conduct as paragraph 1, appellant argues, the court was collaterally estopped from submitting paragraph 1. When it did so, appellant argues, his double jeopardy rights were violated. *See Ashe v. Swenson*, 397 U.S. 436, 445 (1970) (holding that the established rule of law regarding collateral estoppel in criminal cases is embodied in the Fifth Amendment guarantee against double jeopardy). We are not persuaded by this argument because appellant's threshold premise is flawed.

In this case, appellant made no objection to the trial court's failure to submit both paragraphs of the indictment, and as a result, the record does not show that the trial court's submission was "without the defendant's consent." Thus, the sort of harm contemplated by *Jorn*—"a sua sponte judicial" determination that ultimately deprives the defendant of his right to have his trial completed by a tribunal of his choosing—is not

15

present in this case.

Neither are we persuaded by appellant's general assertion that the trial court's submission of paragraph 1 of the indictment was an implied acquittal of the conduct alleged in paragraph 2. *Jorn* does not stand for this principle, and appellant cites no authority, and we find none, supporting this assertion.

At the most, appellant's double-jeopardy complaint is premature. In this case, appellant's double-jeopardy rights would not be implicated unless the State attempted to re-indict and reprosecute appellant based on the same facts determined by the jury in this case. At this stage, we cannot conclude that appellant's double-jeopardy rights have been implicated.

Appellant's third issue is overruled.

## V.  Motion to Suppress

By his fourth issue, appellant argues that the trial court erred in denying his motion to suppress Officer Bolton's testimony that appellant admitted to eating a joint and that the officer found the residue of chewed marihuana leaves in appellant's mouth. Appellant argues that he was in custody at the time of this admission and search, and because he had not been read his rights yet, the admission of this testimony violated both the Fourth Amendment and articles 38.22 and 38.23 of the Texas Code of Criminal Procedure. *See* U.S. CONST. amend. IV; *Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966); TEX. CODE CRIM. PROC. ANN. art. 38.22, §§ 2–3, art. 38.23(a) (West, Westlaw through 2013 3d C.S.).

16

## A.    Standard of Review

We review a trial court's ruling on a motion to suppress under a bifurcated standard.  *Hubert v. State*, 312 S.W.3d 554, 559 (Tex. Crim. App. 2010); *Shepherd v. State*, 273 S.W.3d 681, 684 (Tex. Crim. App. 2008); *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000).   The trial court is given almost complete deference in its determination of historical facts, especially if they are based on an assessment of credibility and demeanor.   *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010).  The same deference is afforded the trial court in its rulings on the application of the law to questions of fact and to mixed questions of law and fact, if resolution of those questions depends on an evaluation of credibility and demeanor.   *Id.*   However, for mixed questions of law and fact that do not fall within that category, a reviewing court conducts a de novo review.   *Id.*

In ruling on the motion to suppress, the trial court is the exclusive trier of fact and judge of a witness's credibility.   *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002).   Accordingly, a trial court may choose to believe or to disbelieve all or any part of a witness's testimony.   *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000).   We view all of the evidence in the light most favorable to the trial court's ruling. *State v. Castleberry*, 332 S.W.3d 460, 465 (Tex. Crim. App. 2011).   Therefore, the prevailing party is entitled to "the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence."   *Id.*   Since all evidence is viewed in the light most favorable to the trial court's ruling, we are obligated to uphold its ruling on a motion to suppress if that ruling is supported by the record and is correct under any

17

theory of law applicable to the case. *Ross*, 32 S.W.3d at 856; *Carmouche*, 10 S.W.3d at 327; *State v. Ballard*, 987 S.W.2d 889, 891 (Tex. Crim. App. 1999).

## B. Applicable Law

No statement, either oral or written, of an accused made as the result of a custodial interrogation shall be admissible against the accused in a criminal proceeding, unless the accused, prior to making the statement, voluntarily waives his rights pursuant to the following warning that:

> (1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;
>
> (2) any statement he makes may be used as evidence against him in court;
>
> (3) he has the right to have a lawyer present to advise him prior to and during any questioning;
>
> (4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and
>
> (5) he has the right to terminate the interview at any time[.]

TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2; *see Miranda v. Arizona*, 384 U.S. at 444–45. The defendant must prove that the statement he wishes to exclude was the product of a custodial interrogation before the State is required to show compliance with *Miranda* and the article 38.22 warnings. *See Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007) (quoting *Wilkerson v. State*, 173 S.W.3d 521, 532 (Tex. Crim. App. 2005)). In other words, the State has no burden at all unless the record as a whole clearly establishes that the defendant's statement was the product of custodial interrogation by a law enforcement agent. *Wilkerson*, 173 S.W.3d at 532. A trial court's "custody"

18

determination presents a mixed question of law and fact. *Herrera*, 241 S.W.3d at 526.

Under *Miranda* and Texas law, a "custodial interrogation" is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of [her] freedom of action in any significant way"; in other words, a custodial interrogation is one in which a detainee's freedom of movement is restrained to the degree associated with a formal arrest and not a mere investigative detention. *Thompson v. Keohane*, 516 U.S. 99, 107 (1995); *see State v. Ortiz*, 382 S.W.3d 367, 372 (Tex. Crim. App. 2012).

> We evaluate whether a person has been detained to the degree associated with arrest on an ad hoc, or case-by-case, basis. In making the custody determination, the primary question is whether a reasonable person would perceive the detention to be a restraint on his movement "comparable to . . . formal arrest," given all the objective circumstances.

*Ortiz*, 382 S.W.3d at 372 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 441 (1984); citing *Stansbury v. California*, 511 U.S. 318, 323 (1994)). A traffic stop, by itself, does not constitute "custody" for purposes of *Miranda* and the code of criminal procedure. *State v. Stevenson*, 958 S.W.2d 824, 828 (Tex. Crim. App. 1997) (citing *Berkemer*, 468 U.S. at 437); *see Ortiz*, 382 S.W.3d at 372. And "the mere fact that the suspect becomes the focus of a criminal investigation does not convert a roadside stop into an arrest." *Stevenson*, 958 S.W.2d at 829; *see also Estrada v. State*, No. 04-12-00136-CR, 2012 WL 6720655, at *3, 8 (Tex. App.—San Antonio Dec. 28, 2012) (mem. op., not designated for publication) ("Interrogation has been defined as express questioning or words or actions by police that the police should know are reasonably likely to elicit an incriminating response. . . . However, warnings are required only when a suspect is interrogated while

19

in custody or its equivalent; questioning outside of a custodial environment is not prohibited, even if it is likely to provoke an incriminating statement." (internal citations omitted)), *aff'd*, No. PD-0106-13, 2014 WL 969221 (Tex. Crim. App. Mar. 12, 2014).[3] Questioning during a traffic stop mitigates the danger presented under *Miranda* because traffic stops are presumptively brief and temporary, unlike a police station interrogation, and are more open and take place in public, which lessens the police dominance over a defendant. *See Berkemer*, 468 U.S. at 437–38.

A noncustodial encounter may, however, escalate into custodial interrogation. *See Stevenson*, 958 S.W.2d at 828. The Texas Court of Criminal Appeals has identified four situations which may constitute custody for *Miranda* purposes. *See Dowthitt v. State*. 931 S.W.2d 244, 254–55 (Tex. Crim. App. 1996); *see also Stevenson*, 958 S.W.2d at 828–29. Under *Dowthitt*, a person may be in custody for purposes of *Miranda*

> (1) when the suspect is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the suspect that he cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave.

931 S.W.2d at 255.

---

[3] We note that the Texas Court of Criminal Appeals has recently affirmed the Fourth Court's opinion in *Estrada*. *See Estrada v. State*, No. PD-0106-13, 2014 WL 969221, at *3–6 (Tex. Crim. App. Mar. 12, 2014) (holding that police are free to ask potentially incriminating questions during non-custodial interrogation, and the fact that a question contains an element of a criminal offense bears no independent significance on a custody determination beyond the officer's suspicion communicated to the detainee by the nature of the question itself). Although the higher court's *Estrada* is not designated for publication under rule 77.3 and we are therefore prohibited from citing it as authority, *see* TEX. R. APP. P. 77.3, we nonetheless find the court of criminal appeals's analysis of its facts—a relatively non-coercive traffic stop during which general, investigatory questions were asked by officers to a driver and passenger after finding a bag of marihuana in the vehicle—instructive to our factual analysis herein. *See* 2014 WL 969221, at *3–5.

> Concerning the fourth situation, . . . the officers' knowledge of probable cause [must] be manifested to the suspect. Such manifestation could occur if information substantiating probable cause is related by the officers to the suspect or by the suspect to the officers. Moreover, given our emphasis on probable cause as a "factor" in other cases, situation four does not automatically establish custody; rather, custody is established if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest.

*Id.* (citations omitted). Regardless, "the restriction upon freedom of movement must amount to the degree associated with an arrest as opposed to an investigative detention."

*Id.* (citations omitted).

## C. Relevant Facts

At a pre-trial hearing, Officer Nixon testified that he and Officer Bolton pulled appellant over because he was speeding, a traffic violation to which appellant admitted. Officer Nixon testified that when appellant rolled down his window, he could smell the odor of burnt marihuana. Appellant and his passenger, Meltvedt, were asked to exit the vehicle and stand in the grassy area to the right of the road. Officer Nixon testified that they conducted their investigation in the grassy area on the side of the road for safety reasons and that they separated appellant and Meltvedt "so that one [couldn't] hear what the other" was saying. Officer Nixon first questioned Meltvedt. Officer Nixon testified that Meltvedt admitted to smoking marihuana "three hours ago." Officer Nixon then approached appellant. Officer Nixon testified that Officer Bolton stood by and spoke with Meltvedt when Officer Nixon was questioning appellant. Officer Nixon testified that he told appellant that he could "smell the mari[h]uana on him and also inside [the] vehicle"; appellant responded "that he had not been smoking, that there was no mari[h]uana inside

21

the vehicle." Officer Nixon testified that appellant then gave him consent to search the vehicle.

While Officer Nixon searched the car, Officer Bolton continued to question appellant in the grassy area. Officer Bolton testified that as he was speaking to appellant, he smelled the odor of burnt marihuana on appellant's clothes and breath. Officer Bolton told appellant to open his mouth. He testified that "as [appellant] opened his mouth, I took my flashlight, shined the light inside his mouth and noticed immediately there was [sic] mari[h]uana leaves inside his mouth." Officer Bolton testified that he asked appellant whether he had eaten any marihuana, and appellant responded, "I only ate one joint." Officer Bolton testified that, at this point, he handcuffed appellant and placed him under arrest. In his testimony, Officer Bolton did not recount any details of his conversation with Meltvedt.

Appellant also testified at the hearing. He denied that he ate any marihuana and denied that he told Officer Bolton he had eaten any marihuana. Appellant also described Officer Bolton's questioning of Meltvedt. He testified that he had watched the DVD recording from the patrol car's dashboard camera, which had captured Officer Bolton's interactions with Meltvedt. Appellant testified that Officer Bolton "was screaming at the top of his lungs" at Meltvedt.

With regard to his interactions with Officer Nixon, appellant testified that, when Officer Nixon went to search the vehicle, appellant did not feel that he was free to leave "at that point." Appellant testified that on a scale of one to ten, ten "being the most restrictive of [his] movements," he gauged his feelings of restriction at a nine. When

22

Officer Nixon returned after searching the car, appellant had been handcuffed by Officer Bolton.   Officer Nixon read appellant his rights, and then he searched appellant's mouth. When Officer Nixon asked appellant if he had "eat[en] the dope," appellant refused to cooperate further; appellant testified that, at this point, he told Officer Nixon, "I don't see how I'm going to help myself, you know, by admitting anything to you or incriminating myself."

Finally, we have reviewed the DVD recording of the traffic stop, which was part of the record before the trial court.   We note that only Officer Nixon was wearing a microphone, so the majority of Officer Bolton's interactions with appellant and Meltvedt were not recorded.   We observed the following sequence of events from the video:

- Officers Nixon and Bolton turned on their flashing lights, and appellant pulled his car over to the left side of the road.   Officer Nixon approached the car and asked appellant to move to the right side of the road.   Both appellant's car and the patrol car did so.

- Officer Nixon approached the passenger side of the car and asked appellant to step into the grassy area on the right side of the road.   Appellant was directed to stand in a spot close to the patrol car that was outside the camera's view.

- After asking Meltvedt where the two were headed, Officer Nixon asked Meltvedt to step out of the vehicle and stand in the grassy area to the right of the road. Meltvedt was directed to stand in a spot that was within the camera's view. Both Officers Nixon and Bolton were standing near appellant's car at this point. They appeared to be smelling inside the open window.   Officer Nixon then

23

asked Meltvedt if there was anything illegal in the car; Meltvedt responded, "Not to my knowledge." Officer Nixon asked Meltvedt if anyone had been "smoking dope." Meltvedt responded that he had been, but three hours earlier. Officer Bolton remained with Meltvedt and patted him down while Officer Nixon went to question appellant.

- Officer Nixon asked appellant, "Who's been smoking dope in the car?" Appellant responded, "No one." Without being prompted, appellant told Officer Bolton that there was nothing illegal in the car and that he could search the car. Officer Bolton told appellant that he could smell the marihuana on him, Meltvedt, and in the car. He told appellant, "I'm gonna search the car, so if you have anything there, you might as well come clean now because I will find it." Appellant then denied again that there was anything illegal in the car and told Officer Nixon that he could search it. Before Officer Nixon walked to the car, he asked appellant whether he had any weapons or drugs on his person. Appellant responded that he did not, and Officer Bolton then patted appellant down.

- As Officer Nixon approached the car, next to which Meltvedt was standing, Meltvedt asked if he could put his hands down. Officer Nixon responded, "No. Just keep them right there. That's for both our safety, ok?"

- While Officer Nixon searched the car, Officer Bolton questioned appellant. The vast majority of the conversation between Officer Bolton and Meltvedt was not captured audibly or visually because Officer Nixon was the only person

24

wearing a microphone and appellant was standing outside the visual range of the camera. Officer Bolton appeared in the corner of the video as he shined his flashlight in appellant's mouth. Officer Bolton then turned to Officer Nixon, who was searching the car, and stated, "He ate it," which is captured in low volume on Officer Nixon's microphone. Officer Nixon asked Meltvedt if he ate any marihuana; Meltvedt responded that he had not. Officer Nixon asked Meltvedt if appellant ate the marihuana; Meltvedt responded that he did not know.

- Officer Bolton then approached Meltvedt and began questioning him again while Officer Nixon continued to search the car. Officer Nixon's microphone captured some of the conversation between Officer Bolton and Meltvedt as he searched the car, but the audio is muffled. It is clear that Officer Bolton had raised his voice while speaking to Meltvedt. One question that came through clearly was, "Who was smoking dope in the car?" Officer Bolton was making hand gestures to Meltvedt and appeared agitated. Officer Bolton then put his head in the car where Officer Nixon was searching and asked Officer Nixon to "go look in [appellant's] mouth."

- At this point, Officer Nixon read appellant his rights.

The video does not show when appellant was handcuffed. The video captured none of the audio of the conversation between Officer Bolton and appellant.

**D. Analysis**

The record in this case shows that, at the time appellant allegedly told Officer

Bolton "I ate one joint," a reasonable person would have believed he was under restraint to a degree associated with an investigative detention, which does not trigger the protections of *Miranda* and the code of criminal procedure. *See Stevenson*, 958 S.W.2d at 828; *see also Berkemer*, 468 U.S. at 437. The officers' questions to appellant and Meltvedt were investigatory in nature; the officers were entitled to gather information to determine who, if anyone, was responsible for the odor of marihuana emanating from the car. *See Stevenson*, 958 S.W.2d at 829; *see also Lewis v. State*, 72 S.W.3d 704, 712 (Tex. App.—Fort Worth 2002, pet. ref'd).

Further, there was only one patrol car at the scene and only two officers were present, which is also consistent with a routine roadside investigation.[4] *See Ortiz*, 382 S.W.3d at 374 ("An ordinary traffic stop usually involves a single police car and one or two officers."). And while it is true that both appellant and Meltvedt were patted down and that Meltvedt was required to keep his hands over his head for most of the investigation, it would have been reasonable for the trial court to conclude that the officers did this for their safety. *See Terry v. Ohio*, 392 U.S. 1, 24 (holding that an officer's safety during an investigative detention is paramount and he is therefore justified in conducting a search for weapons); *see also Crain*, 315 S.W.3d at 48; *Maxwell*, 73 S.W.3d at 281 (holding that in ruling on a motion to suppress, the trial court is the exclusive trier of fact and judge of a witness's credibility). Officer Nixon told Meltvedt that he needed Meltvedt to keep his hands over his head "for both our safety." And before Officer Bolton patted

---

[4] Later in the stop, a sheriff's deputy stopped briefly by the scene, but remained there only for a few minutes. Regardless, this occurred after appellant had been read his rights and arrested, so it is irrelevant to whether appellant was in custody at the time of the complained-of statements.

appellant down, Officer Nixon had asked appellant if he had any weapons on him.

Finally, although appellant was handcuffed, this did not occur until after Officer Bolton searched his mouth and after he allegedly made the statement, "I only ate one joint."[5]  Likewise, although Officer Bolton raised his voice to Meltvedt and waved his arms in a seemingly frustrated manner while questioning him, this, too, occurred after the search of appellant's mouth and appellant's statements, the two pieces of evidence he sought to suppress.  And even if this had occurred earlier, the trial court was, again, the exclusive judge of historical facts, and we will not second-guess its interpretation of these events.  *See Crain*, 315 S.W.3d at 48; *Maxwell*, 73 S.W.3d at 281.  In light of the foregoing facts, we cannot conclude that the circumstances here were such that a reasonable person in appellant's position would have believed he was restrained to the degree associated with a formal arrest as opposed to a mere investigative detention at the time Officer Bolton searched his mouth and appellant admitted to eating the marihuana.  *See Ortiz*, 382 S.W.3d at 372–73; *see also Stevenson*, 958 S.W.2d at 829.

We note lastly that the fourth *Dowthitt* scenario is implicated by the facts of this case.  The officers' suspicions were communicated to appellant—from the inception of the traffic stop, appellant was told by the officers that they could smell "dope" in the car and on his person and was asked several times who had been "smoking dope"—and from

---

[5] In their briefs, both parties suggest that it is "unclear" or "uncertain" exactly when appellant was handcuffed.  But at the pre-trial hearing, Officer Bolton testified that he handcuffed appellant after he looked in appellant's mouth and after appellant made the incriminating statement.  The trial court was entitled to credit this testimony by Officer Bolton.  *See Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002) (holding that in ruling on the motion to suppress, the trial court is the exclusive trier of fact and judge of a witness's credibility); *see also State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000) (holding that a trial court may choose to believe or to disbelieve all or any part of a witness's testimony).

our review of the testimony and DVD, appellant was never told he was free to leave.   *See Dowthitt*, 931 S.W.2d at 255.   But this does not, per se, amount to a custodial situation. We must still examine the entirety of the circumstances to determine whether a reasonable person would believe he was restrained to the degree associated with a formal arrest as opposed to a mere investigatory detention.   *See id.*   And at the time Officer Bolton looked in appellant's mouth and appellant made the "I only ate one roach" statement, we do not believe the circumstances had risen to the level of a formal arrest. Unlike the defendant in the court of criminal appeals's recent case, *State v. Ortiz*, who was subject to overtly coercive and accusatory questioning, *see* 382 S.W.3d at 373–74 (after informing the driver-defendant that he had found "something" under his wife's skirt, the officer asked the defendant, "What kind of drugs does she have?"), the officers' questions in this case were general inquiries about whether anyone had been smoking marihuana in the car and whether there was anything illegal in the car.   As stated above, these questions were part and parcel of the investigation the officers were entitled to conduct after they smelled the marihuana; the questions were addressed to both appellant and his passenger and were an attempt to gather information and ascertain whether a crime had occurred and who had participated.   *See Stevenson*, 958 S.W.2d at 829; *see also Lewis*, 72 S.W.3d at 712; *Estrada*, 2012 WL 6720655, at *8.   Prior to the search by Officer Bolton and without prompting by either officer, appellant told Officer Nixon to search his car, stating that there was nothing illegal in the car.   Further, as noted above—and again, unlike *Ortiz*, in which the defendant was handcuffed before questioning and several patrol cars and at least three officers were present, *see* 382

28

S.W.3d at 374—there was nothing overly coercive about the investigation or the officers' behavior here: only one patrol car and two officers were present at the scene, and no one was handcuffed until Officer Bolton saw the marihuana leaves in appellant's mouth. There were adequate circumstances here to justify the officers' suspicion that appellant had been smoking and may have been in possession of marihuana, but this mere fact that appellant became the focus of a criminal investigation did not convert the roadside stop into a custodial interrogation. *See Stevenson*, 958 S.W.2d at 829; *see also Lewis*, 72 S.W.3d at 712–13 (holding that an officer's modest number of questions over a short period time during which the defendant-suspect was not handcuffed was "not the functional equivalent of formal arrest").

Under the facts of this case, *see Ortiz*, 382 S.W.3d at 372 ("We evaluate whether a person has been detained to the degree associated with arrest on an ad hoc, or case-by-case, basis."), we cannot conclude that the investigatory detention of appellant had escalated into a custodial interrogation at the time Officer Bolton searched his mouth and appellant made the incriminating statement, the two pieces of evidence he sought to suppress. *See Stevenson*, 958 S.W.2d at 828. In other words, looking at the circumstances objectively, a reasonable person would not have believed he was restrained to the degree associated with a formal arrest. *See Ortiz*, 382 S.W.3d at 372; *see also Berkemer*, 468 U.S. at 441. Appellant therefore failed to prove that the evidence he wished to exclude was the product of a custodial interrogation, and the trial court did not abuse its discretion in denying appellant's motions to suppress. *See Herrera*, 241 S.W.3d at 526; *see also Hubert*, 312 S.W.3d at 559. Appellant's fourth

issue is overruled.

## VI.  Discovery

By his fifth issue, appellant argues that the State's refusal to respond to his request for exculpatory material constitutes reversible error.   Specifically, appellant points to his pre-trial letter to the prosecutor referencing its investigator's interview of Meltvedt, to which the State did not respond, and his post-trial motion to compel production of this and other exculpatory evidence, on which the trial court did not rule.   Appellant has waived this issue.   *See* TEX. R. APP. P. 33.1(a); *Wilson v. State*, 7 S.W.3d 136, 146 (Tex. Crim. App. 1999) (holding that to preserve *Brady* error, a complaint must be made as soon as the grounds for the complaint are apparent or should be apparent); *In re A.C.*, 48 S.W.3d 899, 905 (Tex. App.—Fort Worth 2001, pet. denied) (same).

With regard to the pre-trial letter, appellant took no action to raise the matter to the trial court.   *See* TEX. R. APP. P. 33.1(a)(1)–(2) ("As a prerequisite to presenting a complaint for appellate review, the record must show that . . . the complaint was made to the trial court by a timely request, objection, or motion . . . and . . . the trial court . . . *ruled* on the request, objection, or motion.") (emphasis added).   The entire trial then proceeded with no mention of the State's alleged failure to produce exculpatory material, and appellant did not object on this basis when Meltvedt testified at trial.   *See In re A.C.*, 48 S.W.3d at 905 (holding that where a defendant failed to object or request a continuance at the time the undisclosed incriminating evidence is introduced at trial, he has waived the issue).   Appellant's first action on the matter was his post-trial motion to compel, and we find nothing in the record indicating that he obtained a ruling from the trial court on

that motion. *See* TEX. R. APP. P. 33.1(a)(1)–(2).

Because appellant failed to preserve the arguments he makes on appeal, we overrule his fifth issue.

## VII. Sufficiency of the Evidence

By his sixth issue, appellant argues that the evidence was factually insufficient to prove that the marihuana cigarette that appellant destroyed was "related to" the marihuana possession offense that formed the basis of his tampering-with-evidence charge. We first note that, per the Texas Court of Criminal Appeals's 2010 ruling in *Brooks v. State*, we no longer conduct separate factual-sufficiency reviews. 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (recognizing that legal and factual-sufficiency standards "have become essentially the same standard and that there is no meaningful distinction between them that would justify retaining them both"). Regardless, appellant cites no authority and makes no argument that would allow us to construe this issue as any sort of sufficiency issue cognizable on appeal. *See* TEX. R. APP. P. 38.1(i); *see also Kuykendall v. State*, 335 S.W.3d 429, 436 (Tex. App.—Beaumont 2011, pet. ref'd) (holding that appellant waived review where his brief lacked any discussion of law or citation to authority). For these reasons, we overrule appellant's sixth issue.

## VIII. Closing Argument

By his seventh issue, appellant complains that the following portion of the State's closing argument was improper:

> I want to comment a little bit more, I'm going to try and hurry through this. I really am. I want to comment just a little bit more about Daniel Meltvedt. You know, we went through this trial and I think the Defendant, the defense attorney overlooked one important fact and that is Daniel

31

Meltvedt wasn't the same Daniel Meltvedt. He was a grown-up. He had put it behind him. He was in the military. He was going to make it a career. He's going to college.

They just didn't believe that he wouldn't, because of friendship, get up here and lie. Well, you put your eggs in a basket and you got to live with it. But I'm going to tell you what, they didn't care, Joshua didn't care, Schmude. Put him on the stand. We're going to ask him. Try to get him to say what he tells you is a lie. Daniel Meltvedt tells you is a lie. Put his military, they want to put his military career in jeopardy. He told you. I'm not going to lie under oath, but they wanted him to do that.

Defense counsel then objected as follows: "I object to that, Judge. That not only is inflammatory and outside the record that's absolutely false." The trial court overruled the objection.

On appeal, appellant argues that the trial court erred in overruling the objection "because the complained of portions not only were outside the record but constituted striking at the appellant" over the shoulders of his counsel. We first note that appellant's argument that the State struck at him over defense counsel's shoulder was not preserved for our review, so we decline to address it on appeal. *See* TEX. R. APP. P. 33.1(a)(1). As to appellant's argument that the prosecutor's statement was outside the record, we disagree.

Permissible closing argument falls into one of four areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) an answer to the argument of opposing counsel; or (4) a plea for law enforcement. *Gallo v. State*, 239 S.W.3d 757, 767 (Tex. Crim. App. 2007). Improper closing arguments include references to facts not in evidence or incorrect statements of law. *Phillips v. State*, 130 S.W.3d 343, 355 (Tex. App.—Houston [14th Dist.] 2004), *aff'd*, 193 S.W.3d 904 (Tex. Crim. App. 2006).

The standard of review for improper jury argument is abuse of discretion. *Powell v. State*, 63 S.W.3d 435,438 (Tex. Crim. App. 2001). In examining challenges to jury argument, this Court considers the remark in the context in which it appears. *Gaddis v. State*, 753 S.W.2d 396, 398 (Tex. Crim. App. 1988) (citing *Denison v. State*, 651 S.W.2d 754 (Tex. Crim. App. 1983)). Counsel is allowed wide latitude in drawing inferences from the evidence so long as the inferences drawn are reasonable, fair, legitimate, and offered in good faith. *Id.* at 398. Closing argument "only becomes subject to reversal if, in light of the record as a whole, the argument is extreme or manifestly improper, violative of a mandatory statute or injects new facts, harmful to the accused, into the trial." *Felder v. State*, 848 S.W.2d 85, 95 (Tex. Crim. App. 1992) (citing *Bell v. State*, 724 S.W.2d 780, 803 (Tex. Crim. App. 1986)).

Here, the complained-of argument referenced Meltvedt's credibility and his motivation to testify. This issue was raised by Meltvedt's admission at trial that he had initially lied to the officers because of his friendship with appellant. Meltvedt went on to testify that he had since joined the military and changed his life; he testified that he wanted to take responsibility and would not lie under oath. On cross-examination, defense counsel asked Meltvedt numerous questions about his earlier lies and asked questions attempting to have Meltvedt admit he lied on the stand when he testified that appellant ate the marihuana.

In light of this testimony, we cannot conclude that the prosecutor's remarks referenced facts outside the record. The remarks were reasonable inferences drawn from the testimony at trial, and the trial court did not abuse its discretion in overruling

appellant's objection to the contrary.   And even assuming the complained-of portion was improper, having reviewed the remarks in context, we cannot conclude the remarks were extreme, manifestly improper, or injected new facts into the record.   Appellant's seventh issue is overruled.

## IX.   Conclusion

We affirm the judgment of conviction.

NELDA V. RODRIGUEZ
Justice

Do not publish.
Tᴇx. R. Aᴘᴘ. P. 47.2(b).

Delivered and filed the
29th day of May, 2014.